Mr. Hamidullin. Good to have you, Mr. Cabins. Thank you, your honor. May it please the court, the prosecution in this case is a radical departure from the historic practice in this country, where we have no tradition of treating enemy soldiers with respect. That has not always been true of our enemies. During the Revolutionary War, the British treated U.S. soldiers as criminals for most of the conflict. The Germans treated the Free French as criminals during World War II. The North Koreans and the North Vietnamese treated United States soldiers as criminals during those conflicts. Until now, this country has always chosen a different path. It is important to point out that a ruling in Mr. Hamidullin's favor would cost the executive branch almost nothing, as it necessarily may continue to detain him as an enemy combatant for the duration of the conflict in Afghanistan. The bottom line is that Mr. Hamidullin is a soldier, not a criminal, and for that reason his convictions should be vacated. The district court in this case committed three distinct legal errors. First, it wrongly made a categorical judgment that Taliban soldiers are not entitled to POW status. Second, it failed to recognize that in an armed conflict, acting on behalf of a state actor or a government in exile that was deposed in that conflict is a defense. Public authority doesn't depend upon whether the government that is installed after the previous government is deposed is a democratic government or one that we like or a caliphate or anything. It depends upon whether the defendant is acting on behalf of a state actor or a government in exile that was deposed in that conflict. And it's your position that the Taliban was the government in exile in 2009? And I don't think that's true, and I don't think it's just my position. The evidence below is that the Taliban that was deposed in 2001 was the de facto government of Afghanistan, continued to have a government structure and continued to have a military. That was the evidence before the district court. Is that true today? It is true today. So will that be true until the last Taliban is dead and gone? Let me be clear. The authority to prosecute an armed conflict continues until the end of the armed conflict. And so if the Taliban continue to have a government in exile, but the armed conflict is over, it is no defense for an individual to stand up and say, I am fighting on behalf of the Taliban because the conflict has ended. But in this case, certainly in 2009, and the government continues even to say today, the armed conflict that began in 2001 has not ended. Do you agree that the Geneva Convention is going to control our analysis of this case? It is one issue. It does not control whether Mr. Hamidullin ultimately obtains relief because we have two other distinct arguments. With respect to the Geneva Conventions, our claim is that Mr. Hamidullin is entitled to POW status. The district court determined that he was not entitled to that status because it determined he did not meet the conditions required to give POW status to a regular armed forces. And the district judge made that determination after a hearing on what was characterized as a motion to dismiss? That's correct. And to be clear, we have... Is that the same as a... In the Geneva Convention, I think it's Article 5, it talks about a hearing before a tribunal. That's right. For a determination of status. Is that what... Would that be the hearing that Judge Hudson had on the motion to dismiss in the context of this case? I don't think you can characterize it as an Article 5 tribunal. No, the government certainly didn't. It's never been an issue. The government's never argued that that's an Article 5 hearing? That's true. Your position is, and the government doesn't contest it, is that there was never an Article 5 hearing? That's right. I don't think anybody disputes that there wasn't an Article 5. At an Article 5... Why wouldn't, as a practical matter, the hearing that was had on the motion to dismiss serve as an Article 5? I think the parties would have to be made aware of that, and I think the government... Well, an Article 3 judge would certainly qualify as a tribunal. Well, let me say that's probably true. It's not completely uncontested. There is a case in Noriega... I understand that. It seems I'm just my instinct. Right, and in the Noriega case in the Southern District of Florida, that judge determined that his determination that Mr. Noriega was entitled to POW status was the equivalent of an Article 5 tribunal. Oh, he did determine that down there? That's the guy from Panama? That's correct, Your Honor. None of the parties suggested that in this case, and also I think it would have been incumbent upon the government to present the information that they presented at trial in that Article 5 tribunal, that Mr. Hamadolin wore militarized clothing, that he was in a command structure, that they used and carried arms openly, and that they attacked a military target that otherwise satisfied the conditions... So you're really not contesting that the failure to give him an Article 5 hearing is an erroneous error here? We are. We think that the failure to give him an Article 5 tribunal is dispositive of the first issue. That is, the failure to give an Article 5 tribunal... What kind of tribunal would you have then? Well, it would be a proceeding where all parties understood the determination... I don't think that a district court can't serve in that position, but that's not the function that I think the district court agreed to serve in this case. Let me get back to Judge Floyd's question, which is, is that dispositive? And I think the answer is no. And the reason is because the public authority defense is broader than the immunity for POW combatant immunity. And secondly, it is a trial issue. When I say it is broader, I mean that public authority applies not just to soldiers, not just to those who wear the uniform. The Office of Legal Counsel has determined that the public authority defense applies to individuals who, for example, CIA civilians, who drive drones and shoot them overseas and harm people in armed conflict. Those individuals would never get POW status. Well, let me ask you about your immunity argument. I can't think... You can correct me if there is... Your Honor, when you say immunity, do you mean POW? Immunity over public authority? Also, your common law immunity claim. Okay. That you have all types of immunity, including double jeopardy and so forth. In my mind, that's always a question of law. And yet, you objected to the trial judge not giving your civil immunity charge to the jury. Why should he be required to do that if that's a question of law? Well, we're talking about public authority. That's the justification that we believe... It's a question of both fact and law. With respect to the law, the judge has to... That's true in any immunity analysis. I think that's right. And the judge has to ask the right legal question. Now, the reason we say it's a question of fact in this case, the leading Fourth Circuit authority on the public authority defense is a case called Fulcher. In that case, it's very unusual. Right before sentencing, a DEA agent wrote to the judge and says, You know what? These defendants may have thought that I authorized them to engage in the conduct that they engaged in, the distribution of drugs in an investigation in a prison. And the district judge granted the new trial, and it went up to this court. And this court said they affirmed... The court affirmed the granting of the new trial and sent it back. And the government said, This is a question of law. This court can determine, based on the evidence that was submitted, whether the public authority applies. And this court said, No. The defendant has to be given the opportunity. And it said, We declined to reach the conclusion that it's a question of law, because neither parties have been furnished with an opportunity to introduce any evidence regarding whether Lincoln and his colleagues at the DEA possessed actual authority to sanction defendants' money laundering and drug activities. So in that decision, the court recognized that the defense has to be given the opportunity... Who wrote that? You always ask that question. This is... Let's see. It is Judge Ludig. Judge Ludig. Ludig. Former Judge Ludig who wrote that opinion. Who was on? Let's see. Let me. Let's see. Judge Ludig, Judge Niemeyer, and Judge Ludig. In what? Year 2000 or something? 2001, Your Honor. So it sounds in affirmative defense, is what you're saying. It is a justification. That's a justification. That's right. And let me be clear. The justification matters in terms of the burden of proof. And so in this case, as we know, if it is a justification, it is something where we are authorized to present evidence. And the question, the legal question... But here Judge Hutchins says you didn't have the evidence to present. That's right, because he asked the wrong legal question. The legal question is, is the defendant acting on the authority of a state actor or a government in exile? That's the question to be asked. Not whether we agree with this. What the judge below asked is, is this a legitimate... That's not what your proposed instruction said, I don't think. Well, our proposed instruction said explicitly what it says in a criminal law treatise, and that is the jury is to determine whether the defendant acted on behalf of a government or insurgent government. And the jury can certainly determine whether the defendant was actually acting on behalf of the state actor or whether they were acting on their own impulse. That is a factual question. In this case, the government itself charged in the indictment that Mr. Hamadullen acted at the behest of the Taliban. The Taliban provided the targeting list. They provided authorization for the attack on the Taliban base, on the Afghan base. Was there evidence... How much of this stuff that you're telling us came in at the hearing when the motion was dismissed? And how much was actually in the record at the trial? Well, what I... It would be like both sides have completed some of that. What I just spoke about is actually in the indictment, and so I think it was taken as true for purposes of the motion. But for the purposes of trial, whether you're entitled to this instruction or not, you've got to have evidence. That's right. And there needed to be. And if you didn't present any, you have to rely on the government's evidence to justify the theory that you want to propound. That's absolutely true. I mean, there's an argument. There's a... The defendant's normally indicted to the theory of his defense, but there has to be evidence to be based. Absolutely. And the evidence... And how was it based here when you didn't present it? The evidence is patent that the Taliban are a government in exile, that we'd opposed them in 2001, that the armed conflict has continued since that time, and that the defendant acted at the behest of that government in exile. And so that is all the evidence that needed to be presented to support a public authority defense. Well, does the fact that the Taliban enjoys universal non-recognition have anything to do with your standing? No. And let me be clear about recognition. Except in one circumstance, recognition is a very poor barometer about who is entitled to immunity. And let me give you an example. Over the last week, we've learned that Taiwan is not recognized by many countries as the government of China. Israel is not recognized by many countries in the Middle East. The Free French were not recognized by their allies until the very end of World War II. And yet, there is no dispute that Taiwanese soldiers or Israeli soldiers or the Free French during World War II are entitled to POW status and recognition as belligerent soldiers. The reason is because we have divorced the conception of recognition from the immunity that we provide to soldiers in an armed conflict for engaging in that armed conflict if they act on behalf of a belligerent power, which means a state power or a government in exile. There is really no meaningful distinction between the individual in this case and the Free French in World War II. And I'll give you one historical example. In the Nuremberg Tribunals, the Germans, some Germans were prosecuted for killing French partisans. And in that case, the killing of those partisans who were seized for fighting against the German administration, the Vichy government in France, those individuals were killed before the allies had recognized de Gaulle's authority or his government in exile. And so, the lack of recognition did not matter. What mattered is that those individuals were soldiers fighting on behalf of a government in exile that had been deposed in that conflict. Now, if World War II had gone on for 15 years and those individuals continued to fight on behalf of that government in exile, that would be the exact and precise situation that we are in now. And the length of the conflict does not matter. What matters is, is the individual acting on behalf of a state actor or a government in exile for purposes of public authority? The last point I'd like to get to is the question of whether these statutes at all were meant to apply to armed conflict. If you look at the list of statutes in this case, they involve conduct such as shooting at a plane or attempting to destroy aircraft or using a machine gun or attempting to harm U.S. nationals. None of those statutes are designed to apply in armed conflict. And when I say that, I mean that Congress did not intend to outlaw war against the United States when it enacted these statutes. These are statutes that are designed to apply in peace. They are not meant to apply to an armed conflict because armed conflict means the use of violent force against enemies on behalf of a state or government. Can you delegate over whether they're entitled to prosecute him in the United States for doing this stuff in Afghanistan? On these run-of-the-mill statutes you're talking about? Yes. I mean, we've got cases up here about that, whether they can prosecute people. We had the stabbing at Kandahar Airport. And you're talking about the Brehm case. Yeah, Brehm. Here you're prosecuting him in Richmond, Virginia for something that happened in the coast probably. And that's a question of— Brehm didn't even argue that. Well, that's a question of extraterritorial jurisdiction. Extraterritorial jurisdiction. You concede extraterritorial jurisdiction. Absolutely. We have no problem with the application of these statutes to— But we've got to be satisfied you're right in that position. Well, certainly. But I don't think there's—we don't certainly contest that these statutes can be applied to an attack. For example, a terrorist attack on a U.S. soldier who is in a place of peace. The question is whether these statutes were meant to apply in war. If the government is right, then we have adopted essentially one side gets to shoot policy in armed conflict. And that does not make sense. That is their plain language argument. The issue is whether these statutes apply in armed conflict, not extraterritorially to places of peace, but whether they were meant to prohibit individuals from shooting back at United States soldiers who have just deposed, for example, the government. The de facto government that everybody recognized was the sovereign government and has not been defeated. Not everybody recognized. There's only three countries. Those were, if I can— You go ahead and answer. Those were official recognitions from three countries, the UAE, Pakistan, and Saudi Arabia. But I think even the United States certainly recognized that the Taliban were the de facto government of Afghanistan. There's no dispute about that. There's an executive order in the Clinton administration recognizing that the Taliban were the de facto leaders and government of Afghanistan. I'll reserve the remainder of my time. Anything else? Thank you very much. Thank you. Mr. Cook, good to see you again. Good morning, Your Honor. It may please the Court. The defendant in this case is not entitled to a combatant defense on two independent grounds. There is, first, and I'll start with the ground the district court relied on, which is the defendant does not satisfy the requirements in Article IV of the Geneva Conventions. Now, as a threshold matter, a point that I want to make clear at the outset is that the government's view, the way that Article IV gets enforceable here is through federal domestic criminal law that recognizes a combatant defense, and that that defense follows the contours and is defined by our treaty obligations, which is the Geneva Convention in this case. But that is, in other words – I'm sorry. Could you rephrase what you just said? Sure. And it may be helpful for me to put it in the context that the Supreme Court decided in Hamdan, because what's going on here is analogous to what the Supreme Court did in Hamdan. So in Hamdan, there was an issue about the enforceability of the Geneva Conventions. And what the Supreme Court said is, look, there was this earlier case, Eisentrager, where they said the 1929 Geneva Convention is not enforceable as an individual right. It's a matter for states to work out among themselves. And the Supreme Court in Hamdan said, look, we don't have to address that question here for the following reason. The government in Hamdan was seeking, via the military commission, to prosecute the defendant there under Article 21 of the Uniform Code of Military Justice. And what the Supreme Court said is, look, if you're going to use Article 21 of the Uniform Code of Military Justice, you have to comply with the law of war and our diplomatic obligations, which include the Geneva Convention. So in other words, the Geneva Convention became an issue in that case and was a standard the government had to meet because the government was seeking to enforce this domestic provision, which is Article 21 of the Uniform Code of Military Justice. Similarly here, we have had a long tradition in federal criminal law in the United States of a combatant defense. And that combatant defense has been refined and given greater shape over the years by our treaty obligations. So the defendant wants to invoke, for example, 1800s vintage cases from the Civil War about a combatant defense. And those have to be read in light of subsequent treaties that we have entered into, just as if you had a common law defense that Congress— I'm sorry, are you saying the government can obtain an indictment against any prisoner of war anywhere, anytime? No, absolutely. That's not what I'm saying. I don't think so. So I'm trying to figure out what you are saying. I'm trying to clarify what— The treaty is self-executed. That is a question that has not been decided, and I don't think this Court has to decide it. Well, let's assume for the sake of discussion that the treaty is self-executed. Correct. What consequence flows from that? Well, even if it's self-executing, in the Supreme Court's opinion in Medellin v. Texas, the Court noted that, and I'll give you a quote, even when treaties are self-executing in the sense that they create federal law, the background presumption is that international agreements, even those directly benefiting private parties, generally do not create private rights or provide for private cause of action in domestic courts. That's in Note 3. But this Court doesn't have to decide either the self-executing nature of the Geneva Conventions or whether it creates private rights of action because both parties are in agreement here that via a federal domestic U.S. combatant defense, you can invoke the Geneva protections and define this combatant defense. So this Court isn't just acting as a complete common law court and figuring out on its own what would be an appropriate scope of a combatant defense, which in places that's what the defendant is asking this Court to do. Well, why? Let's just make it simple. Sure. Why does he not get protection under the Geneva Convention, under Article IV? Under Article IV, there are four requirements that the defendant would have to meet. I know what those are. Does he meet any one of them? He does not meet any one of them. And there was neveróhe never presented evidence at the initial hearing, pretrial hearing that would support those, and he didn't present evidence at trial that would support those. And that makes this a pretty straightforward case at the end of the day. When you look narrowly, you don't have to answer these questions about whether the Geneva Convention is self-executing, whether it creates an individual right of action. I thought he was carrying an AK-47. He was carrying an AK-47. Well, one of them carries arms openly. Well, and that brings up a very importantó Well, you said he didn't meet any of them. Right. That brings up a very important point, Your Honor. An AK-47 is an arm. It is, and to be clearó I thought that everybody agreed he was carrying it when he even fired it. Right. The point I would want to focus the court on is that these defenses are a group determination. If you look at 4A1, it refers to members of armed forces, and A2 says that members of other militia or members of other volunteer corps must fulfill the following conditions. So what is a necessary prerequisite is that you areó So I'm in the wrong subsection? Not that you're in the wrong subsection. It's that you have to be part of a force that complies with these requirements. It's not just that you can say, Look, I'm the Unabomber, I'm part of theó He talked to you all and told you everything. I'm sorry? He talked to the FBI and told them everything, right? That's true. He told them he was the commanding officer. He made a lot of admissions over extendedó Another one of those criteria is commanded by a person responsible for his support. Right, but the key point is that the Taliban, and by extension the Haqqani Network, are not complying with these requirements. And you have toó Well, you're saying if they don't comply with them, we don't have to comply. They don't get the Article 4 protections. Now, there's still the Article 3 protections under Geneva that the governmentó That's the bottom one. It conducts operations in accordance with the law. Since they're not complying, we don't have to treat their people the same way. Well, because they are not part ofó I thought they had a POW over there, but they turned loose here a couple of years ago. You're talking about Bergdahl. Yeah, and they got brought back, and theyó Right, that isó He was treated as a POW. Well, they also have executed U.S. soldiers, which is not in compliance. Maybe they will have, and the British did too. Right, butó I mean, the point that I want to stress to the Court isó This does run both directions. There's more here than the normal deference to prosecutorial discretion on whether to charge somebody with a federal crime to take them to court. There's a lot at stake here. This is the first time y'all ever done something like this. No, the LENDó On this kind of thing? You think you're the only one? The LEND opinion isó The rest of them have gone to Guantanamo. Your Honor, the LEND opinion isó Oh, the LEND thing was he was an American citizen. Right. He was an American citizen, an 18- or 19-year-old boy that was over there caught on his first day of theó when we went in there back in 2002 or whatever it was, late 2001. He was caught up in the back of a trailer truck with a bunch of prisoners. He said, I'm an American. Right. Actually brought him back and he prosecuted him here in the Eastern District of Virginia and he pled guilty and it was over with. There was nothing reviewed. Judge Ellis did some legal work on it for sure. He's a wonderful judge. But that's not much precedent in the LEND case. You didn't catch him shooting at us and saying I'm a commanding officer. Right. The key point, though, I want the court to focus on is the sources of authority for this combatant defense. And it doesn't just come out of nowhere. We have treaties that have defined the scope of this defense as a matter of now U.S. domestic law. And there are two critical criteriaó In combatant defense, it's what? That you're treated as a prisoner of war? Right. If you meet the combatant defense, then you would have POW status. And that was what they were offeringóan instructionóor did offeró an instruction to that effect. They called it public authority. Right. And the judge denied it. Right. And that instructionó Is thatócould we put the label up thereócombatant defense, public authority, prisoner of war? You could, but they'reó I mean, you can argue about whether it's sufficient or not, but we're all talking about the same thing. Right. And that would be at the appendix page 798. But the key point about that is their instruction is both legally wrong and not supported by the evidence. And you can see that it's legally wrong because it has no connection whatsoever to the very topics we've just been discussing, which is Article 4 of the Geneva Convention. But you said to Judge Floyd that none of the criteria were satisfied. That's right. You agreed with Judge King that at least two of them were. No, no, I do not agree with him. He is sayingó He carried arms openly. You agreed with that. He said that he was the commanding officer. That's what happened. I'm disagreeing with the courtó And the commandant's not personally responsible. That that is sufficient to meet the 4A requirements. The key point about the 4A requirements is that it's a group determination. So if your group, your armed force, is not complying with those requirements, then your armed force does not confer on you a combatant immunity defense. So no oneó Well, didn't they kill all the others? Wasn't this a group? Right. He was a part of a group, but that doesn't mean that the TalibanóI mean, the key point is that the Taliban are not complying with these requirements. If you want to say, I'm part of a member of an armed force of a party to the conflict, you've got to show that there's a group there, there's an armed force, not just, hey, individually I've declared myself an army. Well, but that's not dispositive. Well, it's uncontradicted, wasn't it? It's a trial. You all introduced your statements to the FBI. That's true, but as a matteró Don't they need to get a friend's name as well? As a matter of law, that is not sufficient to meet the test. Well, it'd be a jury issue then, whether somebody's going to believe him or not. I mean, it's your evidence of what he said. It is not a jury question that individuallyó Whether he's believable or not is a jury question. You have undisputed evidence that the Taliban does not have a, you know, organized military that meets these four requirements. Well, he said he was the commander. But that doesn't makeó One man called him the coordinator, I think. I don't even know if there were language issues or not either, but that sounds like an organization. Right. Well, let me make the point this way. Focus on the group that was captured. Suppose you haveó How many were captured? That's what I thought Judge Davis was asking. He's the only one. Right. Only him. But he was with a group ofó The rest got killed. Right. There was a group of insurgents. Some of them, as Jake Stepanovich testified, were wearing American uniforms. One had a North Face jacket. That's appendix page 1195. It's not enough for the defendant to say, Well, I had what counted as a uniform. The rest of these guys, yeah, he's got a North Face jacket on. He's got American uniforms. But because I say I had a uniform on, therefore I meet the requirement. That's not a workable way to confer combatant immunity. That would completely undermine the purposes of these conventions. What did the French resistance fighters wear? They wore uniforms. Let me explain wható This isn't just a hyper-technical requirement. They were guerrillas. They were in disguise, French resistance. Separate question about guerrilla fighters and resistance fighters. But let me focus on what this requirement about uniforms is meant to do. We have this provision in the Geneva Conventions to protect civilians. The idea is that when forces try to blend in with the civilian population, that is a significant threat to the civilian population. That's why we have this requirement. I don't want the court to lose sight of what was, I think, a very important document introduced about how the Taliban conducted warfare that shows that they probably were not complying with these 482 requirements. If you look at the Taliban rules and regulation booklet that was seized on July 15, 2009, and was dated May 9, 2009, so right before theó Was that seized from him? I'm not sure, Your Honor. I don't think so. I think it was separate. Right. I think it was separate. But it was admitted and the dates are not contested. And among the rules listed in that, going to this uniform, was, quote, it said, the mujahideen should always have the same uniforms as the locals because it will be difficult for the enemy to recognize them, and also it is easy for the mujahideen to go from one location to another. That would be in the Government's Hearing Exhibit 14 and the Trial Exhibit 13 and discussed at page 238 of the appendix. And what that's showing is, by design, they are trying to defeat the very purposes of why you have this requirement, which is you want the force to distinguish itself from the local population so that you don't have civilian casualties. And they're saying, well, actually, we're trying to exploit that very thing. We're trying to blend in with the local population. We're wearing U.S. military uniforms, a North Face jacket, things like that. What if three of them out of a unit of 24 commit those violations? Are you saying that delegitimizes the POW claims of everybody in the unit? I'm saying that you've got to be part of an armed force that complies. And looking at two or three people isn't going to answer the question. Maybe it's more helpful if I turn to the compliance with the law of war. So, for example, there is uncontested evidence that the Taliban went out and after people voted, cut off the fingers of people who voted. There's evidence that they conducted suicide bombing. Indeed, the Taliban rules gave a rule about conducting suicide bombings.  And clearly do not satisfy the A2D. And if you're part of a force that systematically is out there violating the rules of the law of war, you can't come in and say, my force confers on me combatant immunity. That would create terrible incentives. That's not how these provisions are understood. And so you have to have a necessary condition. If tonight a platoon of Taliban combatants, uniformed, carrying AK-47s, are captured in Kandahar, the government has the option, as a matter of law, bringing them to Norfolk or Richmond and trying them in civilian courts or treating them as POWs. How's up to that, based on your argument? Right. We would say, yeah, and I haven't gotten to the other separate ground, which is that Article 2 is not satisfied in the sense that this is not an international conflict. And so this is treated as a civil war. The Article 3 protections are ones that the U.S. government recognizes as applying to the Taliban. And the Supreme Court said in Hamdan that the Article 3 protections are going to apply in this conflict. And that's not in dispute. And those provide a series of significant protections, including in particular on the question of prosecution, that you have to use regularly constituted courts. And so, like, it should not come as a surprise to anyone. Regular constituted courts is what you did here. Right. You're saying this is an Article 3 prosecution? Right. And so the question that shouldn't come as a surprise to anyone is that the So Article 3 applies here? This is permissible under Article 3? Right, exactly. If a Taliban member went out there and committed a suicide bombing, the person who directed it could be prosecuted as having engaged in a criminal act. So Congress wants Taliban fighters brought to the United States and prosecuted in civilian court. That's the position of? The question is whether detention, military commission, Article 3 prosecution, all three are available. Well, how do you decide which one of those three you're going to use? Well, that's principally an executive branch decision. That's an executive. So it's up to the executive branch. Once you get into the court, what's left to the judge? Anything? Oh, of course. I mean, What's left to the jury? Anything? I mean, this defendant got a jury trial because we went to But he was not even on his defense. That's because his defense failed as a matter of law, just like You gave him a trial if you don't want the face of it. This is no different than a defendant comes in and says, I want to assert a duress defense and doesn't meet the basic prerequisites for duress. That defendant doesn't get a duress instruction because there's no evidence to support it. It's uncontested evidence. He says that my defense of being in prison or war, Entitlement to prison or war arises from the government's evidence. He can argue that, and I'm entitled to argue my defense and get my instruction based on what the government introduced, not what I intend to introduce. It arises out of this. And the government introduced everything I said. I don't have to get on the witness stand because the government put the FBI agent up there who said what I said. Right, but as a matter of law, the evidence that the government presented was insufficient to establish the defense. Well, and if you're right, maybe you're right on that. I'm happy to continue answering the court's questions. I see my red light is on. Mr. Davis, I may have cut you off on something. Wait, I did. We never did ask you about Article V. Article V, right. A tribunal. Right. That he never did, if there's any doubt, right? Right. What is it if there's any doubt? There must be a doubt arising. Should any doubt. Right, there wasn't. Should any doubt. Right. Should any doubt arise as to whether persons having committed a belligerent act and fallen into the hands of the enemy belong to any of the categories that are arranged in Article IV? Such persons have the right to have their status determined by a competent tribunal. Right. And you say it never did apply. Or it did apply and was satisfied. Right. No doubt was arising because by the time of this prosecution in 2009, And who decides that, that there's no doubt? Well, I mean, the court can look at the record now and see that there shouldn't be deemed to be a doubt arising. But as the court was also indicating during defense counsel's argument, at this point we've now had hearing and trial. Was there a determination made under Article V about doubt? No, because there wasn't a doubt arising in this case. At the point of. So there was no determination made as to doubt being no doubt in the district court. Was there a determination made by the United States Attorney or the Attorney General? I mean, the district court's conclusion that there wasn't a combatant immunity defense here and that there were insufficient evidence to get the instruction, I think, easily encompasses and goes way beyond what you would have under Article V. So that's what I was talking to them about, is whether what happened at the pre-trial hearing on the motion to dismiss satisfy the requirement under Article V of the determination to satisfy a competent tribunal. It's hard to see what would be left that hadn't been covered by that or what harm could have flowed at this point. If the court accepts that there's no valid defense here for a combatant defense, then I fail to see what possible difference it could have made. So it all goes back to whether the instruction should have been given and they should have been ordered to argue their theory of defense. That's right. And as a matter of law, there really is not sufficient basis. That's the question. If we agree with you up to that point, then the only question would be whether he got a fair trial. That's correct. That would get you to the point where you tried. And the question being whether he did get a fair trial when he was tried because his defense was taken away from him by the court who ruled as a matter of law that he couldn't ask the jury whether he was entitled to a combatant defense or the public authority defense or the prisoner of war defense or whatever you want to call it, the instruction he offered. Does that respond to what I said there? I don't know whether I have a question in there or not. It might have been. Is that about right? Candidly, I'm not quite certain of the question in there. Okay. Would you say anything you want in response to that? Sure. Well, briefly, Your Honor, so there wasn't a doubt arising, so we don't think there's a problem under Article V. But if there is, the trial took care of that. Very good. Thank you, Mr. Cook. Good to have you here, as always. Mr. Gaiman. I'd like to make six brief points. The first, starting with Article V. Article V is premised on the idea that entitlement to POW status is an individual determination. I'd point to a site that we put in the district court briefing. It said JA 76, where Major General John Altenberg wrote a publication. He said, The most troubling and obvious error was the decision not to conduct third Geneva Convention Article V tribunals in Afghanistan, a decision that was, quote, made in the face of unanimous opposition from all uniformed attorneys, judge advocates at every level of command. It is an individualized determination, not a blanket determination. Otherwise, you don't need Article V tribunals. Who does it and when does it have to be done? Usually it's done in the theater in the first, and I'm quoting, I think, from the Hamdi litigation, but there were about 1,900 Article V tribunals when we invaded Iraq. But there were no Article V tribunals in this case. Usually it's done in theater. Secondly, I would say, and just to be clear, the government has no authority. That is a blanket determination. It is an individualized determination, so if you have a platoon where three members are wearing uniforms and the rest are not, they may be treated differently. Second point, the failure to present evidence below. Article V places the burden on the government. That is why our failure at the initial hearing to present any evidence, which was certainly borne out that our client did satisfy the conditions at trial, but our failure to do so at the initial hearing is immaterial because it's the government's burden to disprove the doubt that arises when an individual claims POW status. Article V says the burden is on the government? That's right. Article V says when a doubt arises, and doubt arises when an individual claims entitlement to POW status. You get that burden out of it. Article V. That's right. The third point here is that it really doesn't matter which provision of Article IV of the Third Geneva Convention you look to because, in fact, Mr. Hamadullah met the four components of 4A2. In reality, he was about as regular an armed soldier for the Taliban as you can get there, and that's reflected in the fact that these people were not wearing pajamas and sandals. They were authorized by the Taliban. They wore militarized clothing. That's 1123 and 24 and 1240 of the JA. They had a command structure. They bear arms openly, and they attacked a military target. And his admissions all bear all of that out. That's exactly right. And so it is very clear he satisfies those conditions. To be sure, if you are a member of the military, just like special forces, you don't really have to wear a uniform. Regular armed forces are assumed to meet those requirements. They don't have to in order to achieve POW status. That doesn't matter in this case because he did meet those components. Fourth point. Public authority is distinct from the Geneva Convention. My friend tries to conflate the two, and it's very clear from the OLC's position in the shoot-down memo about CIA employees and this court's own en banc decision in Al-Shamari, where the defense contractor in Iraq says, look at these civil war cases, Dow versus Johnson, Coleman. That authority and immunity still applies under our common law, domestic immunity for individuals acting on behalf of a government actor or a government in exile. It is distinct from Geneva. Fifth point. Self-execution. The government completely ignores the fact that this is a defensive use of a treaty. If I can just continue my answer. You can go right ahead. Thank you. The government ignores the fact that this is a defensive use of the Geneva Conventions in response to the government's criminal prosecution. We're not asking to use Geneva as a private right of action. It is just like the case of Cook versus the United States. We've cited it in the papers. It's a prohibition case. The Tariff Act of 1922 authorized seizures at 12 miles out from the United States. There was a separate treaty with Britain which limited the scope of our ability to seize, and the court said that because of that treaty, our government lacking power to seize lacked power because of the treaty to subject the seized British vessel to our laws. There was no private right of action in the Tariff Act or in the treaty with Britain, but it was a defensive use of the treaty, and that's why we can use the Geneva Conventions here. Closing point. The reason that we ask the court to respect the principle that soldiers are not criminals, subject to domestic criminal law, is ultimately to benefit our own soldiers. Our own soldiers should not be subject to domestic criminal law just like Mr. Hamadel. And for that reason, we ask the court to vacate the convictions below. You all want us to vacate, dismiss the indictment and vacate the convictions? Yes, we'd be happy with that. But that's your first position. That's right. And you've got an alternative position. That's right. You want a new trial. That's right. This was a one-sided trial where we weren't able to present a new defense. The new trial is primarily premised on the destruction and the failure to give in unless you make the argument. That's right. When there's some evidence you've acted on behalf of a government actor or government in exile, you have to be able to present that defense. And if I can just say, in the very small handful of cases where we've actually tried people for domestic crimes, they have been able to present that defense to the jury. So the government or the district court cites the case of Eunice from the D.C. Circuit, separate defense, military order defense. But that was a defense that was given to the jury about whether the Lebanese militia were a military organization. Do you cite those cases? Yes, we do. Well, when I'm talking about the cases that are given to a jury, one is the Eunice case from the D.C. Circuit cited in the papers. Another is a reference in Winthrop's military precedence to a prosecution of an Indian chief, Plenty Horses, where he killed a cavalry. And that defense that he was acting pursuant in an armed conflict was given to the jury, and he was acquitted. I will say separately, and it's not in the papers, there was a prosecution of Confederate seamen during the Civil War. That is that there was a bifurcated approach. Land soldiers were considered combatants. Naval forces of the Confederacy were considered pirates. So there is, and it's not in the papers, but there is a piracy prosecution of a Confederate sailor. It's in the Southern District of New York. 1861. Did the President later vacate that and pardon that fellow or something? It was given to the jury, and the question of whether he was acting on behalf of a belligerent power, and the jury hung, and then there was no prosecution. So it's your position that all that law that you just cited is not subsumed by the Geneva Conventions? That's right. And the reason is that the Geneva Conventions is a separate immunity from trial. We never get to trial because the Geneva Conventions are designed to protect individuals from any kind of domestic criminal prosecution except for conduct that occurs outside of the conflict. For example, a German soldier who engages in a rape, that's something that can be prosecuted. Or a German soldier who engages in a war crime, that can be prosecuted in a military commission. But for conduct that is squarely within the context of the armed conflict, the Geneva Conventions prohibit prosecution. The public authority defense typically is a defense that is given to the jury. We ask the judge pre-trial to say, look, all of the facts are in our favor, and that's why the court should rule pre-trial because this man acted on behalf of a government actor in an armed conflict. But if he's not going to rule in our favor at that point, it has to be given to the jury. Was there any debate over the contents of the instruction from a legal standpoint? Did the government nitpick, or the judge, or did you all argue that whether this should be in here or something else should not be in here, that kind of thing? Well, we proposed the instruction. The government moved to strike the instruction pre-trial. I've seen the instruction, and I know they moved to strike. That's right. Was there any in-play about the contents? No, the court simply said, I'm not giving this instruction. I've already ruled. And then at the charge conference after the trial, the defense said, you know, just for the record, we submitted this public authority instruction. The court didn't rule on it. Then post-trial, we asked for a new trial based on the fact that the evidence at trial supported the public authority defense, and the judge rejected that. So we have no idea what the district court thinks of your proposal. Well, I think we have a pretty clear idea. I mean, other than its inapplicability. Right. I'm talking about the specifics of it. Right. There was no debate about the specifics of it. I mean, I looked at it. I had some questions about it, but I didn't see where anybody else had ever studied it. No, the court rejected it on the principle that the Taliban were not a suitable military organization. Thank you very much. We appreciate your work on both sides of this case. Outstanding, and we appreciate your arguments. We're going to take the matter under advisement. We'll come to you on great counsel just after we adjourn the court for the week. Sign and die. This honorable court stays adjourned. Sign and die. God save the United States and this honorable court.
judges: Robert B. King, Henry F. Floyd, Andre M. Davis